Max T. WilliaMs., ISB #11015
Jack Nicholas Wagner, ISB #11244
WILLIAMS. LAW GROUP, PLLC
417 S. 13th Street
Boise, ID 83702
Telephone: (208) 917-1608
Facsimile: (208) 269-3106
info@williaMs.lawgroupboise.com

*Attorneys for Plaintiff Rolina Schnuerle*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROLINA SCHNUERLE, | Case No.  1:22-cv-00070-DCN |
| Plaintiff, | |
| vs. | **DECLARATION OF ROLINA SCHNUERLE IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| SAN JOAQUIN VALLEY COLLEGE, INC., a California Corporation, | |
| Defendant. | |

Rolina Schnuerle declares and states as follows:

1. I am over the age of 18, and I am competent to testify truthfully to the matters herein.

2. I make this declaration based on my personal knowledge of the allegations and claims contained within my Amended Verified Complaint.

3. At all times relevant to this matter, I was employed as a dental hygiene instructor at Carrington College in Boise, Idaho.

4. To the best of my knowledge, Defendant purchased Carrington College and was the owner of Carrington during most, but not all of the allegations I have complained about.

5. On Nov 5, 2020, our Dental Hygiene program director Ms. Watkins and Dr Thomas, the supervising dentist instructed me to have a student administer local anesthetic to a 25-year-

old female patient who had taken methamphetamine in the parking lot of Carrington college just prior to her appointment. Administration of local anesthetic to a patient who has used methamphetamine within 24 hours is an absolute contraindication and is potentially life threatening.  There is a risk of stroke or cardiac arrest in these patients.  I was a professor at Carrington College teaching pain management (local anesthesia administration) as well as pharmacology.  I utilized three textbooks in these courses and all of them state administration of local anesthetic with vasoconstrictor to a patient using meth is absolutely contraindicated due to risk of stroke, cardiac arrest or even death.  In the clinic, on November 5, 2020, I told Ms. Watkins I disagreed with their decision to administer the anesthetic and she told me that if the supervising dentist believes it is okay that we should give the patient the anesthetic.  I defied Ms. Watkins orders and recommended to the student and the patient that they reschedule her appointment for a time when the patient did not have methamphetamine in her system.  I personally dismissed the patient from our clinic.  Dental hygiene treatment is not considered emergency care and there is no justification for giving anesthetic in this circumstance.  The patient told me she was not experiencing any dental pain which would be the only reason a supervising dentist could justify the risk of stroke or cardiac arrest in a patient using methamphetamine within 24 hours of local anesthetic administration.  We did not provide restorative dental treatment in the Carrington clinic so there would not have been a situation that justified the administration of the anesthetic.  I wrote my resignation the evening this occurred and submitted it two business days later.  I wrote the resignation after months of retaliation from Ms. Watkins following a formal complaint I made to HR in August 2020 and because I feared for my own professional license and the personal safety of patients, students, and

faculty.  I did not list my concerns in my initial resignation letter because I was submitting it to Rachel Watkins who was the source of the problems.  I later wrote a detailed list of reasons for my resignation and sent it to as many people in leadership as I could.  The decisions made by Rachel Watkins that jeopardized the health and safety of patients, students and faculty were the source of my resignation, so I sent my concerns to her supervisors instead of sending it to her. My resignation letter is referenced as Exhibit 6 of the Schnuerle Depo. filed by Defendant in its summary judgment motion.

6. Ms. Watkins put the lives of patients and students at risk again when she made the decision to administer potentially contaminated anesthetic cartridges of Lidocaine.  As part of the Carrington Dental Hygiene program, students are taught that Lidocaine anesthetic cartridges administered during oral injections for pain management during dental procedures should never have large bubbles as it is an indication of possible contamination or spoilation. The general medical practice, as well as procedure advised by several manufacturers of Lidocaine anesthetic cartridges, is to discard such cartridges. A true and correct copy of the manual for QMS. Lidocaine (LIDO) produced by manufacturer ThermoScientific attached hereto and referenced as Declaration of Rolina Schnuerle Exhibit A.

7. On or about November 12, 2019, Dr. Hunt, an onsite Carrington dentist, and I observed several Lidocaine anesthetic cartridges with large bubbles, indicating potential contamination during mock anesthetic exams where students practice injections on each other. Dr. Hunt notified Ms. Watkins, the dental hygiene program director and recommended to Ms. Watkins that the cartridges should be discarded or returned to the manufacturer. Ms. Watkins ignored Dr. Hunts medical recommendation. Ms. Watkins then

instructed Dr. Ryan, who is in charge of all supplies to our dental hygiene clinic, to return potentially contaminated anesthetic cartridges into circulation to be administered to clinical patients of the Boise community and to students who utilize the anesthetic cartridges on each other during practice injections. I spoke with Terry Hippler, the sales representative for Henry Schein, whom we purchased the cartridges from prior to learning they would be administered to patients, and he told me Carrington only needed to return the cartridges of potentially contaminated anesthetic and Carrington's account would be credited for the cost of the anesthetic.  Rachel Watkins made the decision to risk the safety of patients and students using these potentially contaminated anesthetic cartridges instead of returning them at no cost to Carrington.  In Exhibit B of Alana Schrock's declaration, Rachel Watkins claims. she reviewed this information in the local anesthesia textbook with me prior to her decision to use these cartridges.  This is untrue.

8.  On Oct 30, 2020, there were several workers in hazmat suits doing what we believe, was mold remediation in the classroom adjacent to our public clinic.  I was helping students who had a medically compromised elderly patient and two pediatric patients while this occurred.  Shantel Robinson, the clinic coordinator and Doctor Lewis, the supervising dentist each told me they called Ms. Watkins with concerns about the safety of patients, students and staff in the clinic. Ms. Watkins made the decision to keep the clinic open after a faculty member became ill and students and other faculty had headaches and burning, watering eyes.  Ms. Watkins was not in the building or on campus to experience the caustic environment or symptoms experienced by those of us who were in or near the clinic.  I never received any communication about this event and Carrington college did not inform me of any potential risk to personnel who did not have the protection of the hazmat personal

protection equipment. I asked Maribel Polo, the dental hygiene front desk manager, if she knew why the workers were wearing hazmat suits and what they were doing and she said she did not know and that she had not been notified about any work being done in the building that day.

9. Ms. Watkins our program director, allowed the use of ultrasonic instrumentation on patients during a WREB clinical exam at the beginning of the COVID pandemic, and right after staff and students were allowed to return to in-person instruction at the Carrington campus. This was in violation of our clinical policy and protocol at the time. We discussed ultrasonic instrumentation not being allowed by Carrington in faculty meeting prior to this WREB exam as well as after the exam when the instrumentation was still not allowed in the clinic.  We were told that the building did not have the appropriate ventilation to allow the use of this instrument and the aerosols it created.  Ms. Watkins told faculty she planned to "ask for forgiveness instead of permission" from leadership. Ms. Watkins disregarded and violated Carrington's policy in this case.  Ms. Watkins claims I supported her decision to disregard the policy.  This is untrue.

10. A patient who was treated in our clinic and participated as a patient during the WREB (regional clinical competency exam) by our students was in the ICU after developing an infection following care he received in our clinic.  The patient did not have a signed treatment plan to receive treatment in our clinic because Rachel Watkins told faculty the students could "clean a few teeth" prior to the board exam without a treatment plan. It was the decision of Rachel Watkins to provide partial treatment for these patients without consent which risked patient safety, liability of Carrington and of hygiene faculty helping students in these patients.  Rachel Watkins denied this to leadership of Carrington in

Exhibit B of the Declaration of Alana Schrock.  I was told by Rachel Watkins in writing that the patient "was on his own" after he presented to our clinic for help. The patient developed a life-threatening infection and was treated in the ICU.

11. Contaminated instruments that had been used on a previous patient were used intraorally on a patient in clinic and Ms. Watkins told Christy Corley, a dental hygiene instructor to inform the patient the contaminated instruments "may have been used on him." when it was evident that they had been used in his mouth.

12. During a faculty meeting the Executive Director Barry Brooks, and Ms. Watkins, told faculty to "just pass" a student in spite of uncontrollable shaking hands during local anesthetic administration. Several faculty members voiced concerns about passing a student who could not safely give oral injections and of the risk of paresthesia in the patients during oral injections given by this student.  After this faculty meeting, only two specific instructors, Wanda O'Harra and Vicki Van Hoogen, who did not object to "just passing" the student in spite of the potential harm to the patient, were allowed to observe and grade this student during local anesthetic administration.  Ms. Watkins lied to Carrington leadership about this matter.

13. Ms. Watkins allowed student to teacher ratios in violated of CODA-Dental Hygiene Accreditation Standards, Section 3-6, by having a 10 student to 1 teacher ratio. This ratio is not accepted by CODA and puts the public at risk.  Students need instruction and supervision while they provide treatment to insure the health and well-being of patients. They are not licensed to provide care and it is potentially unsafe for them to do so without supervision.

14. In August 2020, I and five other faculty members sent letters to Carrington's Human Resources Department with numerous complaints about Carrington's curriculum being incorrectly taught to students, as well as concerns related to the disregard of safety protocol and conduct of Ms. Vicki Van Hoogen. My complaint included the failure of Carrington to address improper instruction regarding asepsis protocol in the clinic by Vicki Van Hoogen (a close friend of Ms. Watkins) which was a risk of potential infection or disease transmission.  Vicki Van Hoogen told one of our students to "make up" a medication when the student's patient could not remember the name of the prescription medication she was taking.  I cited many examples of situations and interactions with Vicki Van Hoogen that demonstrated either lack of instruction for students or negligent instruction that risked the safety and well-being of patients.  Our letters were submitted to human resources after at least four instructors informed Ms. Watkins of witnessing this type of behavior from Vicki Van Hoogen.  It became evident that Ms. Watkins supported Vicki Van Hoogen in these matters instead of supporting the majority of the faculty.  Retaliation occurred to the people who spoke out about the behaviors of Ms. Van Hoogen, including myself as I've testified to in my deposition.

15. On Aug 17, 2020, I received confirmation from HR that they created a ticket for my complaint.  I do not know the dates of letters submitted by other faculty regarding Vicki Van Hoogen.

16. On Aug 20, 2020, Vicki Van Hoogen resigned her position at Carrington College. At least one instructor, Karrie Olson-Abernathy, who wrote a letter of complaint, declined an interview with HR as a result of Vicki Van Hoogen's resignation because many of the concerns she had were related to Vicki Van Hoogen.

17. On Sept 14, 2020, Vicki Van Hoogen was rehired in her position as an instructor at Carrington.

18. On Sept 28, 2020, I received a letter from Alana Schrock stating the case and my complaint were closed after an investigation.  After the conclusion of the five-week investigation, the toxic and hostile work environment became even more inflammatory, and the decisions made by Ms. Watkins that disregarded the safety and health of faculty, students and patients became more egregious. I sent examples with explanations of retaliation from Ms. Watkins to Thomas Corbett who was supposedly investigating my concerns.  There was retaliation from Ms. Watkins following my complaint to HR.  One of the ways Ms. Watkins retaliated was with intimidation.  She approached me shortly after I filed the complaint and told me that she "talked to HR about me" then she paused and when I didn't reply right away, she said "I talked to Thomas Corbett about you".  I didn't know what to say because I was told by Mr Corbett not to discuss the investigation with anyone.  Then Ms. Watkins said she had "reached out to HR" on my behalf with questions about paid time off I was taking for a basal cell carcinoma lesion removal procedure on my upper lip.  I did not ask her to speak with HR on my behalf nor did I ask her about the paid time off I was planning to take.  I Planned to take standard paid time off that I accrued and had available to me.  In nearly eight years of employment, Ms. Watkins nor any other program director, had ever 'reached out' to HR for me about paid time off or for any other reason.  Nor did I ever involve the human resources department when taking paid time off.  Five of the six faculty members who wrote letters of complaint to Carrington's HR department resigned shortly after the conclusion of the five-week investigation Carrington claims they conducted.

19. I witnessed more conduct after August 2020 that I found concerning. In the last incident, where I was instructed to have a student administer local anesthetic to a patient on methamphetamine, I no longer felt safe in the workplace and feared the health and well-being of students and patients in our public clinic.  I felt that I had to leave Carrington for my own health, safety, and protection of my professional licensure.

20. I detailed the additional complaints in a letter I sent to Carrington leadership on November 19, 2020. This included the mold remediation incident that occurred on October 30, 2020. I also detailed the events of November 5, 2020, that was the impetus for my decision that I could no longer continue working for Carrington College.

21. On Nov 5, 2020, I drafted my resignation after I personally stopped a student from administering an oral injection of anesthesia to a patient that admitted to using methamphetamine in our parking lot just before their procedure. I brought my concerns to the supervising dentist who told me to go ahead with the injection despite my legitimate concerns that were based on my professional training and experience. I then went to Rachel Watkins with my concerns and was told by Rachel to do what the supervising dentist says. I knew it was dangerous and potentially deadly to inject the patient with anesthesia, so I refused to allow the student to perform the injections on the patient and released the patient from our clinic. In Exhibit B of the Declaration of Alana Schrock, Tara Micelli states in an interview with Rachel Watkins regarding my allegations that Dr Thomas released the patient from the clinic.  This is untrue.  During the phone interview I had with Helen Fairchild, also detailed in Exhibit B, we discussed this incident and she said "it sounds like there is a problem with the supervising dentist'.  If I did not release the patient on meth, it

is highly probable and plausible that Dr. Thomas would have had the student administer the local anesthetic.

22. I was contacted a few times by Carrington's internal investigator, Thomas Corbett, following my August 2020 complaint and answered a few questions about my allegations as well as a discussion about the retaliation I experienced from Ms. Watkins. During a conversation about the retaliation of Ms. Watkins, he asked me to send him the names of two students who informed me Ms. Watkins had asked them several times, what they described to me as 'leading questions' about me.  The students felt Ms. Watkins was provoking them to say something negative about my clinical instruction following an incident in clinic where Vicki Van Hoogen became aggressive toward me.  I provided the names of the students to Thomas Corbett and at least one of the students said she was not contacted by Thomas Corbett or anyone from Carrington about the incident.

23. I never received any information about the outcome of the investigation until Alan Schrock sent me a letter stating that the investigation was complete and that no wrongful conduct was substantiated.  In response to my retaliation claim, I did send copies of schedules to Mr. Corbett, and Helen Fairchild acknowledged in our phone interview that she reviewed a schedule where I had 9 scheduled sessions compared to 5-7 for other full-time faculty. *See* Decl. of Alana Schrock Exhibit B. I sent Mr Corbett the schedule changes that proved Rachel Watkins scheduled me for 12 hour sessions that were a hardship for students and for me yet their declaration states I never provided documentation to support my claims. There are other false statements in their declarations.  They state that I claimed Rachel Watkins sent me an email about the ongoing investigation and I did not.

24. In November 2012, I had carpal tunnel surgery performed on both wrists after developing symptoms that made full time clinical dental hygiene practice too painful.  In 2013, I had some relief following the surgery but it gradually returned and I began working as an instructor and eventually a didactic professor at Carrington in January of 2014 which allowed me to earn a living in my field of study without the severe pain in my hands and wrists experienced during dental hygiene clinical practice.

25. After I left Carrington, I attempted to find comparable employment. I was able to get part-time or temporary work with a few dentists in the Treasure Valley but ultimately was unable to find a position that would give me the same benefits and salary I had with Carrington.

26. I eventually sold my home of two years in Boise and moved to Bonners Ferry because I could not afford the cost of living in Boise without a comparable income to that of Carrington.

27. I currently work twelve hours per week in a dental office as a hygienist and continue to experience pain in my hands and wrists and I have a small online shop on Etsy.com.

28. I planned to retire as an instructor at Carrington but that is no longer possible because of the hostile and unsafe work environment the Defendant allowed and refused to remedy.

I declare under penalty of perjury that the foregoing is true and correct.


DATED this 3rd day of February 2023.          /s/ Rolina Schnuerle
                                              Rolina Schnuerle

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of February 2023, the foregoing **DECLARATION OF ROLINA SCHNUERLE IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served upon the following parties by the method(s) indicated below:

John Ashby
Hawley Troxell
877 W. Main St., Ste. 1000
PO Box 1617
Boise, Idaho 83701
Tel: (208) 344-6000
email: jashby@hawleytroxell.com
email:tbarton@hawleytroxell.com

☐ Hand Delivery
☐ U.S. Mail, postage prepaid
☐ Facsimile:
☒ E-mail
☒ I-Court ECF

/s/ Max T. WilliaMs.
Attorney

**Thermo** SCIENTIFIC

# QMS® Lidocaine (LIDO)

**IVD** For In Vitro Diagnostic Use Only

**Rx Only**

**REF** 0374686

This Quantitative Microsphere System (QMS) package insert must be read carefully prior to use. Package insert instructions must be followed accordingly. Reliability of assay results cannot be guaranteed if there are any deviations from the instructions in this package insert.

## Intended Use
The QMS® Lidocaine assay is intended for the quantitative determination of lidocaine in human serum or plasma on automated clinical chemistry analyzers.

The results obtained are used in the diagnosis and treatment of lidocaine overdose and in monitoring levels of lidocaine to help ensure appropriate therapy.

## Summary and Explanation of the Test
Lidocaine is an anti-arrhythmic agent administered intravenously by either injection or continuous infusion. It is specifically indicated in the acute management of ventricular arrhythmias such as those occurring in relation to acute myocardial infarction, or during cardiac manipulation, such as cardiac surgery.[1] Lidocaine is metabolized primarily by the liver. N-ethylglycyl-2,6-xylidide (MEGX), glycyl-2,6-xylidide (GX), and 4-hydroxy-2,6-xylidine (4-OH-XY) are the major metabolites.[2] 4-OH-XY, which comprises 73% of the dose is found in urine. Other metabolic products recovered in urine in amounts less than 1% are 3-hydroxy lidocaine, 3-hydroxy MEGX, and 2,6-xylidine. MEGX has 80 to 90% and GX has 10 to 26% of the anti-arrhythmic potency of lidocaine.[3] Concentration monitoring is warranted by lidocaine's extensive interpatient variability in disposition and by its narrow therapeutic index.[3]

## Principles of the Procedure
The QMS Lidocaine assay is a homogeneous particle-enhanced turbidimetric immunoassay. The assay is based on competition between drug in the sample and drug coated onto a microparticle for antibody binding sites of the lidocaine antibody reagent. The lidocaine-coated microparticle reagent is rapidly agglutinated in the presence of the antilidocaine antibody reagent and in the absence of any competing drug in the sample. The rate of absorbance change is measured photometrically. When a sample containing lidocaine is added, the agglutination reaction is partially inhibited, slowing down the rate of absorbance change. A concentration-dependent classic agglutination inhibition curve can be obtained with maximum rate of agglutination at the lowest lidocaine concentration and the lowest agglutination rate at the highest lidocaine concentration.

## Reagents
### Reagent Kit
QMS Lidocaine, **REF** 0374686, is supplied as a liquid, ready-to-use, two-reagent kit that contains:

**R1** Reagent 1   2 x 18 mL
**R2** Reagent 2   2 x 9 mL

### Reactive Ingredients
| INGRED | Ingredient | Concentration |
|---|---|---|
| R1 | Anti-lidocaine Monoclonal Antibody (Mouse) | ≤5.0% |
|  | Sodium azide | ≤0.05% |
| R2 | Lidocaine-coated Microparticles | <0.6% |
|  | Sodium azide | ≤0.09% |

## Reagent Handling and Storage
- **R1** and **R2** Ready for Use.
- Before use, invert several times, avoiding the formation of bubbles.
- Remove air bubbles, if present in the reagent cartridge, with a new applicator stick. Alternatively, allow the reagent to sit at the appropriate storage temperature to allow the bubbles to dissipate. To minimize volume depletion, do not use a transfer pipette to remove the bubbles.
- When either the **R1** or the **R2** reagent cartridge becomes empty, replace both cartridges and verify calibration with at least two levels of controls according to the established Quality Control requirements for your laboratory. If control results fall outside acceptable ranges, recalibration may be necessary.
- Refer to the analyzer specific Assay System Parameters sheet for reagent on-board stability and other system specific information.

⚠ CAUTION: Reagent bubbles may interfere with proper detection of reagent level in the cartridge, causing insufficient reagent aspiration that could impact results.

The unopened reagents are stable until the expiration date when stored at 2 to 8°C. **Do not freeze reagents or expose them to temperatures above 32°C.**

## Warnings and Precautions
### Precautions for Users
- For in vitro diagnostic use.
- Do not mix materials from different kit lot numbers.

⚠ CAUTION: This product contains human sourced and/or potentially infectious components. Components sourced from human blood have been tested by FDA-approved methods and found to be nonreactive for HBsAg, anti-HIV 1/2, and anti-HCV. No known test method can offer complete assurance that products derived from human sources or inactivated microorganisms will not transmit infection. Therefore, it is recommended that all human sourced materials be considered potentially infectious and handled with appropriate biosafety practices.

**DANGER:** QMS Lidocaine Immunoassay contains ≤5.0% Drug-specific antibody (mouse) and ≤2.0% Human Serum Albumin (HSA).

H317 - May cause allergic skin reaction.

H334 - May cause allergy or asthma symptoms or breathing difficulties if inhaled.

Avoid breathing mist or vapor. Contaminated work clothing should not be allowed out of the workplace. Wear protective gloves/eye protection/face protection. In case of inadequate ventilation wear respiratory protection. If on skin: Wash with plenty of soap and water. IF INHALED: If breathing is difficult, remove victim to fresh air and keep at rest in a position comfortable for breathing. If skin irritation or rash occurs: Get medical advice/attention. If experiencing respiratory symptoms: Call a POISON CENTER or doctor/physician. Wash contaminated clothing before reuse. Dispose of contents/container to location in accordance with local/regional/national/international regulations.

## Specimen Collection and Handling
The following specimen collection tubes may be used for the QMS Lidocaine assay:

|  | Glass | Plastic |
|---|---|---|
| **Serum** | • Serum Separator Tube | • No Additive |
| **Plasma** | • EDTA (K₃) | • EDTA (K₃) |
|  | • Lithium Heparin Tube |  |
|  | • Sodium Heparin Tube (Sprayed Sodium Heparin) |  |

Other specimen collection tubes have not been validated for use with the QMS Lidocaine assay. Follow the manufacturer's processing instructions for serum or plasma collection tubes.

- Some specimens, especially those from patients receiving anticoagulant or thrombolytic therapy may exhibit increased clotting time.
- Centrifuge samples containing precipitates before performing the assay. Inadequate centrifugation of the specimen may cause an erroneous result.
- Ensure specimens are free of fibrin, red blood cells, other particulate matter, and bubbles.
- Remove the plasma or serum from the cells, clot, or gel as soon as possible after collection. Some serum or plasma tubes may not be suitable for use with therapeutic drug monitoring assays; refer to information provided by the tube manufacturer.[4]
- Specimens removed from the cells, clot, or gel may be stored up to 7 days at 2 to 8°C.

## Procedure
### Materials Provided
- QMS Lidocaine Reagent Kit, **REF** 0374686

### Materials Required but not Provided
- Lidocaine Calibrators (6-Level)
- Lidocaine Controls

### Assay Procedure
For a detailed description of how to run and calibrate an assay, refer to the calibrator instructions and instrument specific operations manual.

## Calibration
The QMS Lidocaine assay must be calibrated using a full calibration (6-point) procedure.

Calibration is required with each new lot number. Verify the calibration curve with at least two levels of controls according to the established Quality Control requirements for your laboratory. If control results fall outside acceptable ranges, recalibration may be necessary.

## Quality Control
As appropriate, refer to your laboratory's Standard Operating Procedure(s) and/or Quality Assurance Plan for additional quality control requirements and potential corrective actions.

### Recommended control requirements for the QMS Lidocaine assay:
- A minimum of two levels of controls spanning the medical decision range should be run every 24 hours.
- If more frequent control monitoring is required, follow the applicable local, state, and federal Quality Control procedures for your laboratory.
- If quality control results do not fall within an acceptable range defined by your laboratory, patient values may be suspect and corrective action should be taken.



DECLARATION OF ROLINA SCHNUERLE EXHIBIT A

## Results

The result unit for the QMS Lidocaine assay can be reported as µg/mL or µmol/L. To convert results from µg/mL lidocaine to µmol/L lidocaine, multiply µg/mL by 4.27.[5]

As with all analyte determinations, the lidocaine value should be used in conjunction with information available from clinical evaluations and other diagnostic procedures.

### Result Error Codes

Some results may contain Result Error Codes. Refer to the instrument specific operations manual for a description of the error codes.

## Limitations of the Procedure

In very rare cases, patient samples may contain heterophile antibodies, which may produce low results with the QMS Lidocaine assay.

Interfering heterophile antibodies occur at low frequency in the general population. These antibodies can cause autoagglutination of the microparticle reagent leading to underdetected erroneously low results.

For diagnostic purposes, interfering heterophile antibodies occur at low frequency in the general population. These antibodies can cause auto-agglutination of the microparticle reagent leading to erroneous results that may be unexpectedly low or unexpectedly high. An erroneous result could lead to incorrect patient management; incorrect patient management could potentially cause serious injury or death. Test results should not be used in isolation to make patient management decisions. Results should always be assessed in conjunction with the patient's medical history, clinical examinations, and other clinicopathological findings. An alternative test method should be used to confirm results when results are inconsistent with clinical expectations.

See the SPECIMEN COLLECTION AND HANDLING and SPECIFIC PERFORMANCE CHARACTERISTICS sections of this package insert.

## Expected Values

The therapeutic range for total concentration is stated as 1.5 to 6 µg/mL.[5] Suppression of ventricular arrhythmias at concentrations above 2 µg/mL are likely, but prevention of primary ventricular fibrillation may require higher concentrations in AMI patients. At concentrations exceeding 6 µg/mL the frequency of CNS toxicity increases.[3] A significant number of patients may require concentrations of 6 to 9 µg/mL for arrhythmia control.[6] The benefits and risks of lidocaine concentrations above 6 µg/mL must be determined carefully.[3]

The time to collect the specimen is determined by the reason for monitoring. If the blood concentration is intended to document an adequate concentration early in therapy, the specimen should be collected 30 minutes after the loading dose, or 5 to 7 hours after therapy is initiated if no loading dose is given.[7]

Lidocaine metabolites may contribute to toxicity in patients receiving prolonged (>24 hours) infusions or in patients with renal insufficiency.[3] Lidocaine is 60 to 80% bound to plasma proteins. Of the fraction bound, approximately 70% is associated with alpha-1-acidglycoprotein (AAGP) and 30% with albumin.[8] AAGP concentrations have been reported to increase twofold by the third post-bypass day.[8] Plasma concentrations of AAGP have been reported higher in patients receiving phenytoin, carbamazepine, primidone and phenytoin plus phenobarbital. Females receiving estrogen-progestogen oral contraceptives have lower AAGP concentrations and higher free lidocaine concentrations.[3] Cardiopulmonary bypass patients receive very large doses of heparin. Heparin releases lipoprotein lipase from tissues, which in turn increases free fatty acids and alters free lidocaine concentrations.[8] Therapeutic concentrations of quinidine and disopyramide significantly increases the concentrations of free lidocaine.[3]

Each laboratory should investigate the transferability of the expected values to its own patient population and if necessary determine its own reference ranges.

## Specific Performance Characteristics

Representative performance results obtained on a commercially available automated clinical chemistry analyzer that employs turbidimetric quantitative analysis are shown below.

### Sensitivity

#### Limit of Quantitation (LOQ)

The LOQ of the QMS Lidocaine assay is defined as the lowest concentration for which acceptable inter-assay precision and recovery is observed (≤20% CV with ±10% recovery). The LOQ was determined to be 0.8 µg/mL.

### Assay Range

The range of the assay is 0.8 to 10 µg/mL. Report results below this range as <0.8 µg/mL.

## Linearity

### Linearity by Dilution

A commercially available calibrator (10.0 µg/mL) was diluted with a commercially available "zero" calibrator (0 µg/mL) to achieve samples with concentrations at 80, 60, 40, and 20% of the 10 µg/mL calibrator. Samples were run in duplicate using QMS Lidocaine reagents. The results are shown below.

| Theoretical Concentration (µg/mL) | Rep 1 | Rep 2 | Mean Recovered Concentration | % Recovery |
|---|---|---|---|---|
| 2 | 1.88 | 1.86 | 1.87 | 93.5 |
| 4 | 3.81 | 3.64 | 3.73 | 93.3 |
| 6 | 5.66 | 5.74 | 5.70 | 95.0 |
| 8 | 7.68 | 8.18 | 7.93 | 99.1 |
| 10 | 9.28 | 9.49 | 9.39 | 93.9 |

Mean Percent Recovery 95.0

## Method Comparison

A study was conducted to compare accuracy of recovery of lidocaine in serum and plasma samples ranging from 0.4 to 9.1 µg/mL assayed by the QMS Lidocaine assay to that of a commercially available FPIA immunoassay.

Results of the Passing-Bablok[9] regression analysis for the study are shown below.

| Slope | 1.076 (1.044 to 1.104) |
|---|---|
| Y-Intercept | -0.096 (-0.153 to -0.024) |
| Correlation Coefficient (R²) | 0.986 |
| Number of Samples | 52 |

## Precision

Precision was determined as described in CLSI (NCCLS) Protocol EP5-A2.[10]

A trial-level human serum based commercially available control set containing lidocaine was used in the study. Each level of control was assayed in duplicate twice a day for 20 days on one analyzer, by one operator using one reagent and calibrator lot. Calibration was performed initially and at day 10 of the study. Each of the runs per day was separated by at least two hours. The means were calculated and the between day, within run, total SD, and percent CVs were calculated. Results are shown below.

| Control | N | Mean (µg/mL) | Within Run | | Between Day | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | SD | CV (%) | SD | CV (%) | SD | CV (%) |
| 1 | 80 | 1.76 | 0.10 | 5.66 | 0.10 | 5.41 | 0.14 | 8.13 |
| 2 | 80 | 4.42 | 0.15 | 3.48 | 0.11 | 2.44 | 0.22 | 5.06 |
| 3 | 80 | 8.83 | 0.24 | 2.73 | 0.19 | 2.17 | 0.46 | 5.27 |

Acceptance Criteria of <10% total CV

## Interfering Substances

The following compounds, when tested with the QMS Lidocaine assay at the concentrations indicated, resulted in less than 10% error in detecting lidocaine.

| Interfering Substance | Interferent Concentration | n | Lidocaine (µg/mL) | Percent Recovery |
|---|---|---|---|---|
| Bilirubin | 15 mg/dL | 2 | 7.3 | 91.4 |
| Hemoglobin | 10 g/dL | 2 | 5.3 | 102.0 |
| HAMA type 1* | Normal human level | 2 | 4.4 | 92.0 |
| HAMA type 2* | Normal human level | 2 | 4.4 | 92.0 |
| Triglyceride | 2000 mg/dL | 3 | 5.2 | 97.8 |
| Rheumatoid Factor | 1500 IU/mL | 3 | 5.2 | 98.5 |
| Total Protein | 2-12 g/dL | 3 | 6.9 | 103 |

*HAMA = human anti-mouse antibodies

DECLARATION OF ROLINA SCHNUERLE EXHIBIT A

2

**Metabolite Cross-Reactivity**

The two major metabolites of lidocaine were tested for cross-reactivity. Results are shown below.

| | Metabolite Concentration (µg/mL) | Lidocaine Concentration (µg/mL) | % Cross-Reactivity |
|---|---|---|---|
| GX | 10 | 4.0 | 0.8 |
| MEGX | 100 | 4.9 | 0.8 |

*Drug Interference*

Cross-reactivity was tested with drugs that are routinely administered with lidocaine. Testing also determined whether these compounds affect the quantitation of lidocaine concentrations using the QMS Lidocaine assay. Cross-reactants were analyzed in a lidocaine spiked serum pool at 5 µg/mL. The samples were assayed and the lidocaine concentrations of spiked samples were compared to a control serum. Results are shown below.

| Compound | Concentration Tested (µg/mL) | % Cross-Reactivity |
|---|---|---|
| Mepivacaine | 10 | 63 |
| Bupivacaine | 40 | 20 |
| Acetaminophen | 200 | ND |
| Acetyl cysteine | 1660 | ND |
| Acetylsalicylic acid | 650 | ND |
| Ampicillin-Na | 53 | ND |
| Ascorbic Acid | 60 | ND |
| Cefoxitin | 660 | ND |
| Cyclosporine | 0.5 | ND |
| Digoxin | 0.01 | ND |
| Disopyramide | 10 | ND |
| d-Methamphetamine | 10 | ND |
| Ephedrine | 0.1 | ND |
| Flecainide | 10 | ND |
| Furosemide | 60 | ND |
| Hydrochlorothiazide | 6 | ND |
| Ibuprofen | 500 | ND |
| Isoproterenol | 0.01 | ND |
| Levodopa | 80 | ND |
| Lidocaine-N-ethyl Bromide | 100 | ND |
| Methylodopa+1,5 | 15 | ND |
| Metronidazole | 120 | ND |
| Mexiletine | 100 | ND |
| Phenybutazone | 100 | ND |
| Phenytoin (DPH) | 50 | ND |
| PPX (L-Pipecolicacid-2,6-xylidide) | 10 | 3.4 |
| Procainamide | 24 | ND |
| Propanolol | 2.0 | ND |
| Quinidine | 12 | ND |
| Rifampicin | 64 | ND |
| Tetracycline | 15 | ND |
| Theophylline | 40 | ND |
| Tocainide | 100 | 1.0 |

ND = Not Detectable

**Bibliography**

1.  ASTRA, Westborough, MA, Xylocaine; 1993; 7:021679R00.
2.  Tam YK, et. al. Qualification of three lidocaine metabolites and their conjugates. Pharmaceutical Research, 1990; 7; 5:504-507.
3.  Pieper JA, et. al. In: Applied Pharmacokinetics. 2nd ed. Spokane WA. Applied Therapeutics, Inc 1986;639-681.
4.  Dasgupta A, Dean R, Saldana S. et.al. Absorption of therapeutic drugs by barrier gels in serum separator blood collection tubes. Am J Clin Pathol 1994:101(4):456-64.
5.  Burtis CA, et. al. Tietz Textbook of Clinical Chemistry and Molecular Diagnostics. 4th ed. Elsevier Saunders; 2006:2309.
6.  Alderman EL., et. al. Evaluation of Lidocaine Resistance in Man Using Intermittent Large-Dose Infusion Techniques. Am J Cardiol. 1974;34:342-349.
7.  Burtis CA, et. al. Tietz Textbook of Clinical Chemistry and Molecular Diagnostics. 4th ed. Elsevier Saunders; 2006:1259.
8.  Remmel RP, et. al. The Effects of Hemodilution, pH, and Protamine on Lidocaine Plasma Protein Binding and Red Blood Cell Uptake In Vitro. Pharmaceutical Res. 8, 1:127-130.
9.  Bablok W, et. al. A General Regression Procedure for Method Transformation. J Clin Chem Clin Biochem. 1988;26:783-790.
10. Tholen DW, Kallner A, Kennedy JW, et.al. Evaluation of Precision Performance of Quantitative Measurement Methods; Approved Guideline - Second Edition (EP5-A2). Wayne, PA: The National Committee for Clinical Laboratory Standards, 2004.

**Glossary:**

http://www.thermofisher.com/symbols-glossary



Microgenics Corporation
46500 Kato Road
Fremont, CA 94538 USA
US Customer and
Technical Support:
1-800-232-3342



For insert updates go to:
www.thermoscientific.com/diagnostics

© 2018 Thermo Fisher Scientific Inc. All rights reserved.

All trademarks are the property of Thermo Fisher Scientific Inc. and its subsidiaries.



0156234AW-F-EN
2018 01