UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROLINA SCHNUERLE,<br><br>    Plaintiff,<br><br>v.<br><br>SAN JOAQUIN VALLEY COLLEGE,<br>INC., a California corporation,<br><br>    Defendant. | Case No. 1:22-cv-00070-DCN<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

## I. INTRODUCTION

Before the Court is Defendant San Joaquin Valley College, Inc.'s Motion for Summary Judgment. Dkt. 13. The Court held oral argument and took the matter under advisement. Dkt. 25. For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

### A. Factual Background

Defendant San Joaquin Valley College, Inc. operates a private vocational college, commonly known as Carrington College (hereinafter "Carrington"), in Boise, Idaho. Carrington provides instruction and training to students in a variety of programs, including dental hygiene. Carrington's dental hygiene program offers both classroom and clinical education, with students performing dental hygiene services on patients while under the supervision of Carrington's instructors.

Beginning in 2014, Plaintiff Rolina Schnuerle ("Schnuerle") was a dental hygiene

instructor, and at-will employee, at Carrington.[1] In 2020, Schnuerle became concerned about improper safety practices at Carrington, and particularly by certain actions taken by Carrington's director of dental hygiene, Rachel Watkins, and another Carrington instructor, Vicki Van Hoogen. On approximately August 17, 2020,[2] Schnuerle submitted a letter to Carrington's employee relations department. Dkt. 13-6, Ex. 5. A few other employees submitted similar letters around the same time. Dkt. 13-3, Ex. A. Schnuerle's letter complained about several decisions by Watkins, including that Watkins "recently allowed our graduated students the use of the ultrasonic during the board exam despite the use of ultrasonic instrumentation not allowed in clinic."[3] *Id.* Schnuerle also reported Watkins' alleged favoritism of Van Hoogen and others, and maintained Schnuerle and other faculty members were afraid Watkins would retaliate against them for speaking out against Van Hoogen. *Id.* Schnuerle's August 17, 2020 letter did not allege unlawful discrimination or otherwise report a violation of a specific law, policy, or regulation. *Id.*

Upon reviewing the complaints from Schnuerle and others, Carrington's employee

---

[1] On October 27, 2021, Schnuerle and Jason Sonne, another former instructor at Carrington, filed separate suits against Carrington in Idaho state court. Both suits allege the same six claims against Carrington, and both were filed by Max. T. Williams of Williams Law Group. Carrington subsequently removed Schnuerle and Sonne's cases to this court. *Schnuerle v. San Joaquin Valley College, Inc.*, 1:22-cv-00070-DCN, at Dkt. 1; *Sonne v. San Joaquin Valley College, Inc.*, 1:22-cv-00062-DCN, at Dkt. 1. While Schnuerle and Sonne's cases arise out of a similar general fact pattern, the two cases have not been consolidated.

[2] Although her letter was dated August 5, 2020, Schnuerle testified during her deposition that she did not submit the letter to Carrington until August 17, 2020. *Compare* Dkt. 13-6, Ex. 5 *with* Dkt. 12-5, at 34:21–35:4.

[3] In the field of dental hygiene, an "ultrasonic" is a scaling device that uses ultrasonic vibration to break up hardened calculus deposits on patients' teeth. Christopher Zielinsky, How Ultrasonic Scaling Benefits Patients and Dental Hygienists Alike, Sable News (March 28, 2019, 8:45 AM), https://sableidustriesinc.com/blog/ultrasonic-scaling-benefits-patients-dental-hygenists.

relations department investigated the matter, including by conducting multiple interviews. On September 4, 2020, Schnuerle sent an email to Carrington's investigator, Thomas Corbett, stating she believed she was being retaliated against by Watkins. Dkt. 13-6, Ex. 6. Specifically, Schnuerle alleged that she learned Watkins had asked recent graduates questions about her which the graduates characterized as an apparent attempt to get them to say negative things about Schnuerle. *Id*. In addition, Schnuerle reported that Watkins told her she had inquired with Corbett about Schnuerle's paid time off for a medical procedure Schnuerle was scheduled to have. Schnuerle stated Watkins "had never done anything like this before," and maintained Watkins' inquiry suggested Watkins had "awareness that someone has reached out to HR." *Id*. Schnuerle also stated she believed Watkins was retaliating against her for complaining because Watkins rescheduled Schnuerle's Pharmacology lectures so Schnuerle would be forced to work two twelve-hour days a week. Schnuerle maintained, "I believe the schedule changes were in retaliation and made at least to make me suffer." *Id*. Finally, Schnuerle reported she was afraid of losing her job because Watkins was "in charge" and appeared to be aware that Schnuerle had complained about her. *Id*. Although Schnuerle's concerns about Watkins' purported retaliation were included as part of the investigation, Watkins ended up granting Schnuerle's request to leave Schnuerle's Pharmacology lectures as originally scheduled, and thus did not go through with implementing the allegedly retaliatory scheduling change. Dkt. 13-6, Ex. 7; Dkt. 13-5, at 57:8–59:23.

Ultimately, Carrington's investigation concluded Schnuerle's allegations were not substantiated, and that Carrington had not violated any regulation, policy, or law. Dkt. 13-

3, Ex. A. The investigation also found Schnuerle had not been retaliated against in any way, and determined Watkins did not go through with changing Schnuerle's schedule once Schnuerle alerted Watkins about her concerns. Although the investigation did not find any policy violations, Watkins was informed at the end of the investigation there was a perception amongst some employees that she favored Van Hoogen. Dkt. 13-2, ¶ 9. Carrington provided Watkins with coaching on how to communicate more effectively with her team to eliminate any perception of favoritism. *Id*. The internal investigation was closed on September 29, 2020. Dkt. 13-3, Ex. A.

After her September 4, 2020 email to Corbett, Schnuerle did not thereafter raise any workplace concerns. However, on November 5, 2020, a patient seeking dental treatment presented to Carrington's dental clinic after having recently used methamphetamine. Schnuerle was worried that administering local anesthesia to the patient would be a safety risk and reported this to Watkins. Watkins told Schnuerle that the supervising dentist, Dr. Thomas, was responsible for determining whether the patient could receive anesthesia. While it is undisputed that the patient was ultimately dismissed from Carrington's dental clinic without receiving any anesthesia or other treatment, Schnuerle contends both Dr. Thomas and Watkins told her to administer the injection. Dkt. 20-1, at ¶ 13. However, due to her safety concerns, Schnuerle "refused Dr. Thomas and Watkins' directives, rescheduled and discharged the patient." *Id*.

As a result of the patient incident, Schnuerle wrote a resignation letter later the same evening. *Id*. Schnuerle submitted the resignation letter a few days later, on November 9, 2020. Dkt. 13-2, ¶ 14. Schnuerle's resignation letter did not identify any reason for her

resignation and did not address either the patient issue or Schnuerle's other safety concerns. Dkt. 13-4, Ex. B. Prior to resigning, Schnuerle did not inform Watkins—or anyone else at Carrington—that she felt compelled to resign due to the patient incident, or that she believed she needed to resign because her work conditions were unsafe or otherwise intolerable. Dkt. 13-5, at 151:1–154:4. Instead, on November 19, 2020, ten days after she submitted her resignation letter, Schnuerle emailed a letter (hereinafter "post-resignation letter") to Carrington's employee relations department, outlining several issues she had with her work environment at Carrington. Dkt. 13-6, Ex. 11.

In addition to reporting the November 5, 2020 patient issue, Schnuerle's post-resignation letter alleged that she had witnessed improper Lidocaine administration to Carrington patients. *Id*. Specifically, in November 2019, a supervising dentist at Carrington, Dr. Hunt, noticed air bubbles in some Lidocaine cartridges used by the clinic. Schnuerle alleges that although air bubbles are a sign of contamination, Watkins instructed another Carrington employee to allow the use of the potentially contaminated cartridges in Carrington's clinic. While she disagreed with the use of the Lidocaine cartridges, Schnuerle did not report the Lidocaine issue to anyone at Carrington in 2019, or at any time thereafter, until her post-resignation letter. Dkt. 13-5, at 98:20–99:11.

Schnuerle also reported that in or around August 2019, a patient developed an infection after receiving treatment from several students during a Western Regional Examining Board ("WREB") examination. Dkt. 13-6, Ex. 11. Schnuerle maintained the patient should have been, but was not, prescribed an antibiotic by Carrington's supervising dentist. *Id*. While Carrington disputes Schnuerle's characterization of the patient incident,

Dkt. 13-2, ¶ 21, Schnuerle testified she is unaware of any law or regulation requiring the use of signed treatment plans, and also confirmed that her post-resignation letter was the first time she raised the patient infection issue with anyone at Carrington. Dkt. 13-5, at 107:21–108:5.

Schnuerle next alleged that Watkins allowed ultrasonic instrumentation to be used on patients for a WREB clinical exam, even though Watkins had previously informed students that they would not be able to use such equipment for board examinations due to pandemic-related concerns about the use of aerosol products.[4] Carrington highlights, and Schnuerle testified during her deposition, that no law or regulation prohibits the use of ultrasonic instrumentation, and that this is instead a matter left up to school policy. Dkt. 13-2, ¶ 24; Dkt. 13-5, at 114:6–11. Carrington also notes that Watkins only allowed students to use the ultrasonic instrumentation during their WREB exam after first contacting WREB and confirming that WREB did not have a policy prohibiting ultrasonic equipment during the pandemic, and after obtaining approval to use the equipment from Carrington management. Dkt. 13-2, ¶ 24.

Schnuerle's post-resignation letter also maintained Watkins was negligent in allowing Carrington's clinic to remain open on October 30, 2020, when, during what appeared to be mold remediation work occurring in the classroom adjacent to Carrington's public clinic, several individuals felt sick. Dkt. 13-6, Ex. 11. Although Carrington

---

[4] As noted, Schnuerle also raised the issue regarding the purportedly improper use of ultrasonic instrumentation in her August 17, 2020 letter. Dkt. 13-6, Ex. 5.

highlights Watkins was not working on the day of the purported mold remediation work, and that Carrington's clinic was closed until the strong odor subsided, Dkt. 13-2, ¶ 27, Schnuerle's post-resignation letter was the first time she raised the alleged mold issue with anyone at Carrington. Dkt. 13-5, at 118:10–25.

In her post-resignation letter, Schnuerle also alleged that she, along with other Carrington staff members, was instructed by Watkins and campus director Barry Brooks to "just pass" a student who had issues with her hands shaking while administering injections. Dkt. 13-6, Ex. 11. While Carrington refutes Schnuerle's claims about the student, Dkt. 13-2, ¶ 29; Dkt. 13-6, Ex. 16, Schnuerle confirmed during her deposition that she did not report the student incident to anyone at Carrington prior to her November 19, 2020 post-resignation letter. Dkt. 13-5, at 131:14–18.

Again for the first time in her post-resignation letter, Schnuerle also alleged: (1) Watkins asked Carrington instructors to keep quiet about potential COVID-19 exposures and not to be tested so they could remain at work; (2) Watkins allowed an unacceptable 10:1 student to teacher ratio at a Friday morning clinic; and (3) contaminated instruments were once used on a patient during a WREB practice exam due to Van Hoogen's negligence. Dkt. 13-6, Ex. 11. Schnuerle's post-resignation letter also decried various actions taken by Van Hoogen, again highlighted Watkins' purported favoritism of Van Hoogen and others, and criticized Watkins' and Brooks' leadership. *Id*. With the exception of the use of ultrasonic instrumentation during the July 2020 WREB exam—which Schnuerle included in her August 17, 2020 letter—Schnuerle did not raise any of the alleged safety issues addressed in her post-resignation letter before she resigned from

Carrington. Dkt. 13-5, at 98:19–99:1, 108:1–5, 118:17–25, 131:14–133:15, 134:1–23, 137:22–138:9.

### b. Procedural Background

On October 27, 2021, Schnuerle filed a Complaint against Carrington in Idaho state court, alleging claims for: (1) "Constructive Discharge in Violation of Public Policy for Failing to Maintain Safe Work Environment"; (2) Breach of the Covenant of Good Faith and Fair Dealing; (3) Unjust Enrichment; (4) Negligent Infliction of Emotional Distress; (5) Vicarious Liability; and (6) Negligent Supervision.[5] Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Carrington removed Schnuerle's case to this Court on the basis of diversity. Dkt. 1.

The parties subsequently submitted a joint litigation plan, which included a July 1, 2022 deadline for amending pleadings, a November 18, 2022 deadline for the completion of factual discovery, a December 16, 2022 deadline for the completion of all expert discovery, and a December 16, 2022 deadline for dispositive motions. Dkt. 9. The Court entered a Scheduling Order adopting each of the parties' stipulated deadlines. Dkt. 11. To date, Schnuerle has never filed a motion to amend, a motion to extend the deadline for completing discovery, or a motion to continue any of the Scheduling Order deadlines.

On December 16, 2022, Carrington filed the instant Motion for Summary Judgment. Dkt. 13. Schnuerle did not file a response to the Motion for Summary Judgment until she

---

[5] Schnuerle filed an Amended Complaint (Dkt. 4-4) against Carrington on February 5, 2022—before Carrington removed Schnuerle's case to this Court on February 18, 2022. Dkt. 1. Schnuerle's Amended Complaint alleges the same six causes of action against Carrington. Dkt. 4

was alerted by the Court that she had missed her response deadline. Dkt. 14. The Court ultimately allowed Schnuerle additional time to respond to Carrington's Motion for Summary Judgment. Dkt. 19.

After Carrington's Motion for Summary Judgment was fully briefed, the Court heard oral argument on April 17, 2023.[6] During oral argument, Schnuerle's counsel withdrew Schnuerle's claim for negligent infliction of emotional distress. The Court accordingly considers whether Schnuerle's five remaining claims survive summary judgment.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). Importantly, the Court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

In considering a motion for summary judgment, the Court must "view[ ] the facts in the non-moving party's favor[.]" *Zetwick*, 850 F.3d at 441. However, the Court must enter

---

[6] With the parties' consent, the Court held a joint hearing on Carrington's Motion for Summary Judgment in the instant case and on Carrington's Motion for Summary Judgment in *Sonne v. San Joaquin Valley College, Inc.*, 1:22-cv-00062-DCN.

summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, the respondent cannot simply rely on an unsworn affidavit or the pleadings; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). If the nonmoving party cannot make a showing on an element essential to his or her claims, there can be no genuine issue of material fact because "a complete failure of proof concerning an essential element on the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## IV. ANALYSIS

Carrington seeks summary judgment on each of Schnuerle's five remaining claims, which the Court will address in turn. Before doing so, however, the Court highlights three critical flaws in Schnuerle's response to Carrington's Motion for Summary Judgment.

First, Schnuerle's counsel appears to misunderstand the procedural posture of this case, and repeatedly contends the Court should deny summary judgment because additional discovery is needed. For instance, in her Statement of Disputed Facts, Schnuerle states "more discovery is needed to fully develop the true facts of this lawsuit." Dkt. 20-1, at ¶¶ 12, 17. In her response brief, Schnuerle maintains "Plaintiff still intends to conduct her own depositions of Defendant employees and other witnesses." Dkt. 20, at 16. During oral argument, Schnuerle's counsel also argued the factual record has not been adequately developed, and stated he would like to depose approximately five unidentified individuals

but hadn't done so previously because he believed the case was going to settle.

Schnuerle's suggestion that additional discovery may create a genuine dispute of material fact ignores that each of the discovery deadlines in this case passed *before* Carrington filed its Motion for Summary Judgment. To date, Schnuerle has never asked the Court to extend any of the discovery deadlines. After Carrington filed its Motion for Summary Judgment, Schnuerle also never filed a motion pursuant to Federal Rule of Civil Procedure 56(d) to request additional time to obtain affidavits, declarations, or to take discovery.

Moreover, even if Schnuerle's belated references to a need for further discovery could themselves be considered a request for additional discovery under Rule 56(d), the request is appropriately denied because Schnuerle has failed both to specify the discovery she seeks, and to show how such discovery is essential to oppose summary judgment. *See* Fed. R. Civ. P. 56(d); *Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 619–620 (9th Cir. 2017) (explaining that to prevail on a Rule 56(d) request, a party must set forth in an affidavit the specific facts it hopes to elicit from further discovery, and must also show that such facts exist and are essential to oppose summary judgment).

Given Schnuerle's failure to ever attempt to extend the discovery deadlines, or to file a Rule 56(d) Motion, the time for deposing witnesses or obtaining other discovery has expired. As such, Schnuerle cannot create a genuine issue of material fact by claiming further discovery is needed.

Second, in addition to suggesting additional evidence is necessary to develop her

claims, Schnuerle also repeatedly faults Carrington's counsel for allegedly asking her "narrowly tailored questions which were inherently misguided and focused on events not alleged by Plaintiff" during her deposition. Dkt. 20, at 17, *id*. at 19 (suggesting "Defendant attempts to use Plaintiff's deposition testimony as a sort of smoking gun to soundly dispose of Plaintiff's claims. But Defendant asked questions and solicited answers to its questions regarding elements of claims Plaintiff never brought"), *id*. at 4 (accusing Carrington of "inaccurately utilizing deposition testimony that was non-exhaustive").

Schnuerle thus appears to argue Carrington did not obtain the testimony she has that supports her claims because Carrington's counsel asked the wrong questions during her deposition. Yet, Schnuerle's counsel did not depose Schnuerle—or apparently any other witnesses—before responding to Carrington's Motion for Summary Judgment. Dkt. 20. Nor did Schnuerle's counsel elicit testimony during Schnuerle's deposition to clarify or buttress her claims. *See generally* Dkt. 13-5. If Schnuerle had testimony or other evidence to support her case, it was her counsel's duty to obtain and submit it. That Schnuerle apparently failed to conduct her own discovery during the discovery period is not a reason to deny Carrington summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986) ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant[.]").

Third, and finally, Schnuerle repeatedly faults Carrington for purportedly "applying the wrong legal analysis regarding Plaintiff's claim of constructive discharge," and for "discussing how Plaintiff cannot survive summary judgment because of a claim she never

alleged." Dkt. 20, at 4–7. Specifically, Schnuerle suggests Carrington erroneously interprets her claim for "constructive discharge in violation of public policy for failing to maintain safe work environment" under the framework Idaho courts use to evaluate claims for wrongful termination in violation of public policy. *Id*. Yet, Idaho does not appear to recognize a claim for constructive discharge in violation of public policy,[7] and Schnuerle does not cite a single case, statute, or other legal authority to suggest otherwise.[8] *Id*. Schnuerle also fails to identify the elements of a claim for constructive discharge in

---

[7] This Court, sitting in diversity, must apply the substantive law of Idaho. *Nw. Acceptance Corp. v. Lynnwood Equip., Inc*., 841 F.2d 918, 920 (9th Cir. 1988).

[8] During oral argument, Schnuerle's counsel referenced several cases—without providing case citations—that were not included in Schnuerle's response brief. Although the Court advised Schnuerle's counsel that he could file a notice of supplemental authority with the case citations within one week of oral argument, Schnuerle's counsel did not do so. Nevertheless, the Court has located such cases and finds they do not support Schnuerle's constructive discharge in violation of public policy claim. Specifically, as further explained below, *Hummer v. Evans*, 923 P.2d 981, 987 (Idaho 1996), undermines Schnuerle's public policy claim because the plaintiff in *Hummer*, unlike Schnuerle, cited an Idaho statute as the legal source of the public policy at issue.

In two other cases Schnuerle's counsel cited, *Hollist v. Madison Cnty.*, 2013 WL 5935209 (D. Idaho Nov. 1, 2013) and *Wallace v. City of San Diego*, 479 F.3d 616 (9th Cir. 2007), the plaintiffs claimed they were constructively discharged without due process, or in violation of a specific federal statute, but did not contend they were constructively discharged in violation of public policy. Thus, neither case is helpful to Schnuerle's constructive discharge in violation of public policy claim.

The Court has also considered *Feltmann v. Petco Animal Supplies, Inc*., 2012 WL 1189913 (D. Idaho Mar. 20, 2012), and finds it inapposite due to its disparate procedural posture. Specifically, in *Feltmann*, another judge of this District repeatedly expressed doubt that Idaho state courts would recognize a cause of action for constructive discharge in violation of public policy but denied defendant's motion to dismiss because further factual development could potentially support plaintiff's claim, which plaintiff could also still amend. *Id*. at *6–7. By contrast, the discovery deadlines have expired in this case—as has the deadline for filing a motion to amend—and Schnuerle has never attempted to continue or reopen them. Unlike the plaintiff in *Feltmann*, Schnuerle cannot engage in further factual development to support, or amend, her constructive discharge in violation of public policy claim.

Finally, the Idaho Supreme Court recognized the public policy exception to at-will employment in *Jackson v. Minidoka*, 563 P.2d 54, 57 (Idaho 1977), but cited only general definitions of public policy that other jurisdictions have recognized, such as protecting employees who refuse to give false testimony, who file a workman's compensation claim, who refuse to date a superior, or who serve jury duty against the wishes of the employer. *Id*. at 58. None of the aforementioned examples are at issue in this case, and Schnuerle's counsel did not otherwise explain how *Jackson* supports Schnuerle's specific public policy claim.

---

violation of public policy, much less offer evidence to establish a genuine issue of material fact with respect to such elements.

Although the Court further addresses Schnuerle's constructive discharge in violation of public policy claim below, in the absence of *any* authority to the contrary, the Court declines to extend Idaho's public policy exception to the at-will employment doctrine under the circumstances at issue here.

### A.      Constructive Discharge in Violation of Public Policy

It is undisputed that Schnuerle was an at-will employee.  Dkt. 13-2, ¶ 4; Dkt. 20-1, at ¶ 4. An employer is generally free to terminate an at-will employee for any reason, or for no reason at all. *Thomas v. Med. Ctr. Physicians, P.A.*, 61 P.3d 557, 563 (Idaho 2002); *Edmondson v. Shearer Lumber Products*, 75 P.3d 733, 737 (Idaho 2003) (explaining an at-will employee may be terminated by his or her "employer at any time for any reason without creating liability"). "In Idaho, the *only* general exception to the employment at-will doctrine is that an employer may be liable for wrongful discharge when the motivation for discharge contravenes public policy." *Edmondson*, 75 P.3d at 737 (emphasis added). A claim for wrongful termination in violation of public policy represents "a narrow exception to the at-will employment presumption[.]" *Bollinger v. Fall River Rural Elec. Co-op, Inc.*, 272 P.3d 1265, 1271 (Idaho 2012). The exception is limited because if "not narrowly construed, the exception could eviscerate the [at-will employment] rule." *McKay v. Ireland Bank*, 59 P.3d 990, 994 (Idaho Ct. App. 2002).

#### 1.  *Protected Activity*

Because the public policy exception to at-will employment is narrow, the "public

policy exception is triggered only where an employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain legal rights and privileges." *Bollinger*, 272 P.3d at 1271. In determining whether an employee's activity is protected, Idaho courts first assess "whether there is a public policy at stake sufficient to create an exception to at-will employment." *Id.* (quoting *Thomas*, 61 P.3d at 565). Next, a court considers "whether the employee acted in a manner sufficiently in furtherance of that policy." *Bollinger*, 272 P.3d at 1271. For the reasons explained below, Schnuerle fails to establish either element.

    a.  <u>Public Policy</u>

The question "of what constitutes public policy sufficient to protect an at-will employee from termination is a question of law." *Venable v. Internet Auto Rent & Sales, Inc.*, 329 P.3d 356, 361 (Idaho 2014) (cleaned up). Although "many activities and interests engaged in by employees benefit the community . . . not all of them are recognized as falling within the public policy exception." *Id.* (quoting *McKay*, 59 P.3d at 994). Instead, the "claimed public policy generally must be rooted in caselaw or statutory language." *Bollinger*, 272 P.3d at 1271 (quoting *Edmondson*, 75 P.3d at 738); *see also Mallonee v. State*, 84 P.3d 551, 557 (Idaho 2003) (explaining the public policy of Idaho "is found in [its] constitution and statutes").

Applying this principal, Idaho courts have addressed the public policy exception to at-will employment on several occasions. *See*, *e.g.*, *Watson v. Idaho Falls Consol. Hospitals., Inc.*, 720 P.2d 632, 637 (Idaho 1986) (highlighting Idaho's public policy of

protecting employees' participation in union activities); *Hummer*, 923 P.2d at 987 (finding the termination of an employee based on the employee's compliance with a court-ordered subpoena was contrary to the public policy of Idaho); *Ray v. Nampa Sch. Dist. No. 131*, 814 P.2d 17, 21 (Idaho 1991) (finding plaintiff's public policy claim survived summary judgment where the plaintiff contended he was terminated for reporting safety code violations to the state electrical engineer, and where employer admitted plaintiff was fired because he had "made contact with the state electrical engineer").

To recognize a public policy exception to at-will employment, Idaho courts require a legal source for the policy at issue. For instance, Idaho Code Section 44-701 protects union membership. Thus, in *Watson*, the Idaho Supreme Court upheld a jury instruction which provided that a termination based on an employee's union activities would be contrary to Idaho's public policy. 720 P.2d at 635. Similarly, in *Hummer*, the Idaho Supreme Court held the termination of an employee based on the employee's compliance with a court-issued subpoena was contrary to the public policy of the state, as established by the legislature in Idaho Code Section 19-3010. 923 P.2d at 987.

Notably, in *Sorenson v. Comm. Tek, Inc.*, 799 P.2d 70, 74 (Idaho 1990), the Idaho Supreme Court rejected an employee's claim that it was against public policy to offer an employee a new employment position with the understanding that the terms of the new position would be negotiated in the future, and to then fire the employee for attempting to negotiate. *Sorenson*, 799 P.2d at 74. In so holding, the *Sorenson* court explained the "claim that failure to negotiate is a violation of public policy, *in the absence of a statute* requiring employers to bargain with employers, is not supported by our prior cases." *Id*. (emphasis

added) (collecting cases). The *Sorenson* court thus affirmed the lower court's entry of summary judgment in favor of the employer on the employee's wrongful termination in violation of public policy claim. *Id.*; *see also Weerheim v. J.R. Simplot Co., Inc.*, 2006 WL 2435506, at *4 (D. Idaho Aug. 22, 2006) (finding reporting safety concerns was an important public policy where an Idaho statute required certain safety protocols).

However, in *Ray*, the Idaho Supreme Court reversed summary judgment on the plaintiff's public policy claim where the employer admitted the plaintiff was fired because he had reported building and safety code violations to the state electrical engineer. 814 P.2d at 21. As such, the *Ray* court held plaintiff's allegation that he was fired after raising specific safety and building code violations fit within Idaho's public policy exception. *Id.* While *Ray*, 814 P2d at 21, suggests terminating an employee for reporting safety violations contravenes public policy, *Sorenson* and the other cases cited above imply that the public policy of Idaho must itself be recognized by a specific statute. *Sorenson*, 799 P.2d at 74; *Watson*, 720 P.2d at 637; *Hummer*, 923 P.2d at 981; *Weerheim*, 2006 WL 2435506, at *4.

Regardless, Idaho case law is clear that to trigger the public policy exception to at-will employment, an employee must at least identify a legal source to support the employee's claim that the employer's actions violated public policy. *Bollinger*, 272 P.3d at 1272; *Venable*, 329 P.3d at 362 ("In order to properly state a claim under the public policy exception, a plaintiff must specifically identify the public policy in question[.]"); *Ray*, 814 P.2d at 21 (reversing summary judgment where it was undisputed plaintiff was terminated for reporting specific safety code violations to the state electrical engineer); *see also Lord v. Swire Pac. Holdings, Inc.*, 203 F. Supp. 2d 1175, 1180 (D. Idaho Mar. 12,

2002) ("The Court is unable to find a clearly articulated legislative statement of public policy which would bring [plaintiff's] conduct within the ambit of the public policy exception to at-will employment. In the absence of case law or statutory language to support [plaintiff's] claim, the Court finds no basis for expanding the Idaho law that defines the public policy exception to the at-will doctrine").

Schnuerle vaguely alleges Carrington subjected her "to working conditions that violated public policy in that [e.g., Plaintiff was required to work in unsafe or unhealthful conditions without appropriate protective equipment]."[9] Dkt.4-4, ¶ 42 (brackets in original). Schnuerle does not identify any specific statute, regulation, or policy Carrington allegedly violated. The Idaho Supreme Court has expressly held an employee's reports of safety concerns are not sufficient to establish a public policy claim where, as here, the employee fails to link the employer's alleged safety violations to any specific legal requirement. *Bollinger*, 272 P.3d at 1272.

In *Bollinger*, the Idaho Supreme Court found the district court appropriately granted an employee's claim for retaliatory discharge and termination in violation of public policy where the employee failed to show she was engaged in a "protected activity" under Idaho law. *Id*. at 1272. The plaintiff in *Bollinger* was the safety director for her employer, and her job duties included: (1) "implementing and carrying out state and federal laws and regulations, including conducting monthly safety meetings;" (2) overseeing safety

---

[9] Similarly, in response to Carrington's Motion for Summary Judgment, Schnuerle broadly contends Carrington violated public policy by "failing to maintain a safe work environment." Dkt. 20, at 5.

programs required the Occupational Safety and Health Administration ("OSHA"); and (3) "performing safety and compliance inspections." *Id*. at 1267. The plaintiff was also responsible for reporting to management any "failure to comply with an applicable safety law, rule, or regulation." *Id*. According to the plaintiff, when she reported such issues, her General Manager "refused to take measures to remedy safety issues Bollinger brought to his attention, ignored requirements for equipment, and became hostile toward her." *Id*. When she was subsequently terminated, the plaintiff brought various claims against her employer, including claims for retaliatory discharge and wrongful termination in violation of public policy. *Id*. at 1268. The trial court granted defendant summary judgment on each of plaintiff's claims. *Id*.

On appeal, the Idaho Supreme Court held the lower court properly granted summary judgment on plaintiff's claims for retaliatory discharge and termination in violation of public policy because plaintiff was not engaged in a protected activity when she was terminated. *Id*. at 1271. In so holding, the *Bollinger* court explained:

> Bollinger fails to pinpoint any particular statute or regulation that would support her claim that her reports of safety issues implicated a public policy sufficient to justify an exception to at-will employment. Although we have recognized that reporting of safety violations may constitute protected activity, we also require identification of the source of the public policy that would trigger the exception. Bollinger's affidavit in opposition to summary judgment only vaguely asserts that [her General Manager] 'refused to implement or to follow safety rules and regulations of which [Bollinger] made him aware and ignored requirements for equipment; procedures; and regulations.' Nowhere in her briefing below or on appeal does Bollinger identify a legal source for those alleged rules and regulations.

*Id*. at 1272 (citing *Edmondson*, 75 P.3d at 738).

Like the plaintiff in *Bollinger*, Schnuerle alleges Carrington's management, and

particularly Watkins, engaged in a litany of purportedly "unsafe or unhealthful conditions," but fails to identify a legal source for the safety practices Watkins and/or Carrington purportedly violated. Dkt. 4-4, ¶¶ 19–26, 42. While Schnuerle's Complaint broadly contends Carrington's dental hygiene education and procedures are governed by the Commission on Dental Accreditation ("CODA"), and that Carrington's safety procedures are governed by OSHA, Schnuerle does not link the allegedly unsafe practices she witnessed to any specific CODA or OSHA regulations. *Id.* at ¶¶ 15–16. Significantly, the Idaho Supreme Court held the plaintiff in *Bollinger* failed to create a genuine issue of fact to suggest she engaged in a protected activity where, like Schnuerle, she generally suggested her employer committed OSHA violations, but failed to associate any of the employer's alleged violations with a specific OSHA regulation. 272 P.3d at 1272. In so holding, the *Bollinger* Court explained: "Although the state does have a general public policy interest in maintaining a safe workplace, the public policy exception would swing too wide if it protected advocacy of any of the infinite number of safety measures employers could take, regardless of whether they were required by law."[10] *Id.* at 1272.

Similarly, in *Venable*, an employee alleged her employer fired her because she refused to violate the Idaho Consumer Protection Act ("ICPA"). 329 P.3d at 361. While recognizing the ICPA "does establish public policy for the State of Idaho," the Idaho

---

[10] The Court does not doubt Schnuerle's genuine concern for the students and patients at Carrington. However, the fact that an employee was subjectively trying to do something good or to prevent harm is not enough to establish a public policy claim, absent a legal source for the policy at issue. *Bollinger*, 272 P.3d at 1272; *Lord*, 203 F. Supp. 2d at 1180 (noting a plaintiff's good faith belief in the righteousness of her conduct is too tenuous a ground upon which to base a public policy claim) (citation omitted)).

Supreme Court rejected plaintiff's wrongful termination in violation of public policy claim because the plaintiff was required to do more than "simply cite to a broad-ranging act, without specifying a specific provision or implementing regulation that was allegedly violated." *Id*. at 361. The *Venable* court explained, "[i]t is simply insufficient to point generally to an act comprising a chapter of the Idaho Code and leave it to the court to match up the alleged misconduct with an applicable provision of the chapter." *Id*. at 362.

Here, like the plaintiff in *Venable*, Schnuerle vaguely suggests Carrington violated CODA and OSHA, but fails to associate the purportedly unsafe conduct she witnessed with a specific provision of CODA or OSHA. *Id*. And, like the plaintiff in *Bollinger*, Schnuerle alleges she was subjected to various "unsafe or unhealthful" practices but fails to identify a legal source to establish such practices were unsafe or unhealthy. *Bollinger*, 272 P.3d at 1272. Further, to the extent Schnuerle alleges Carrington violated its own internal policies—such as by allowing the use of ultrasonic equipment during a WREB exam—Schnuerle has not shown Carrington failed to honor any binding policy in place at the time of her resignation.[11] Even if she had, a mere failure to adhere to Carrington's private policies does not fall within any of the narrow public policy exceptions to Idaho's at-will employment doctrine. *Id*.

---

[11] As noted, Schnuerle admitted during her deposition that the use of ultrasonic instrumentation during a board exam was a matter left up to school policy. Dkt. 13-5, at 39:17–40:6, 114:6–11. Schnuerle stated she was not aware of any law, or policy from an administrative body or regulatory authority, prohibiting the use of ultrasonic instrumentation during student exams, and also confirmed that Carrington was free to change its policy regarding the use of such instrumentation. *Id*. at 39:23–40:11. Thus, Schnuerle has not identified any evidence to suggest the use of ultrasonic instrumentation during a board exam was against even Carrington's internal policy.

In short, while maintaining a safe work environment may constitute a public policy sufficient to expand the at-will employment doctrine, Schnuerle's public policy claim fails as a matter of law because she fails to identify *any* legal source to support her claim that her reports of safety issues implicated a public policy sufficient to justify an exception to at-will employment. *Id.* at 1272.

b. Schnuerle's actions

Even if Schnuerle had identified a public policy sufficient to create an exception to at-will employment, she cannot establish she acted "in a matter sufficiently in furtherance of that policy" because, with the exception of the use of ultrasonic instrumentation during a board exam,[12] Schnuerle did not report any of the purported safety violations she has identified in this lawsuit until ten days *after* she had already resigned. *Id.* at 1271. The Idaho Supreme Court has held an employee who reports wrongful conduct protected under the public policy exception may not be terminated for reporting the conduct to superiors within the company. *Thomas*, 61 P.3d at 565.

Without citing any evidence, Schnuerle contends that she "notified Carrington management, including Rachel Watkins, regarding her complaints and concerns well before her complaint letter in August 2020 or her constructive discharge in November 2020." Dkt. 20, at 6. However, during her deposition, Schnuerle admitted her post-resignation letter was the first time she reported her concerns about the alleged: (1)

---

[12] Again, Schnuerle has not established the use of the ultrasonic instrumentation during the WREB exam was against any regulation, law, or policy.

November 5, 2020 patient issue, Dkt. 13-5, at 151:1–154:4; (2) improper use of contaminated Lidocaine cartridges, *id*. at 98:20–99:11; (3) August 19, 2020 patient infection and treatment plan issue, *id*. at 107:21–108:5; (4) October 30, 2020 mold remediation issue, *id*. at 116:10–118:25; (5) direction by Watkins and Brooks to pass a student with shaking hands, *id*. at 130:10–131:18; (6) statements by Watkins to keep quiet about potential COVID-19 exposure, *id*. at 131:19–132:15; (7) unacceptable 10:1 student ratio at a Friday morning clinic, *id*. at 134:6–20; and (8) use of contaminated instruments during a WREB practice examination, *id*. at 138:5–9. On summary judgment, Schnuerle does not identify any other specific safety concerns she reported prior to her post-resignation letter.

Because Schnuerle has testified under oath that she did *not* report the specific safety concerns she identified in her post-resignation letter—as well as in this lawsuit—*before* she resigned from Carrington, Schnuerle cannot establish she engaged in a protected activity. It would fundamentally defeat the public policy of maintaining a safe work environment to allow a claim where the plaintiff did not identify or report any allegedly unsafe conditions until *after* she had already left the company. *Venable*, 329 P.3d at 580 (explaining that to establish she engaged in a protected activity, the employee needed to not only present evidence of the employer's misconduct, but also of her own conduct in furtherance of the identified public policy).

### 2. Causation

Moreover, even if Schnuerle had reported the various safety issues she identified in her post-resignation letter prior to leaving Carrington, Schnuerle's public policy claim fails

because it is not enough for an employee to show she engaged in a protected activity; she must also establish that the termination or adverse employment action was in fact motivated by her participation in the protected activity. *Edmondson*, 75 P.3d at 739; *Bollinger*, 272 P.3d at 1272 (affirming summary judgment on plaintiff's public policy claim where plaintiff "failed to create a genuine issue of fact that her termination was motivated by her safety reports"). Although the question of causation is generally one for the jury, it may be decided as a matter of law where, as here, there is no genuine issue of disputed fact. *Bollinger*, 272 P.3d at 1271–72.

To establish a wrongful termination in violation of public policy claim, a plaintiff must show a causal relationship between her engagement in protected activity and her termination. *Bollinger*, 272 P.3d at 1271; *Venable*, 329 P.3d at 362 ("Even if Venable had tied a specific bullet point of alleged misconduct to a specific provision of the ICPA, she would need to have presented competent evidence to show that the employer violated the public policy and that she was terminated for engaging in protected activity."); *Summers v. City of McCall*, 84 F. Supp. 3d 1126, 1147 (D. Idaho 2015) (explaining a public policy claim requires a showing that the employer's motivation for the termination contravenes public policy). Here, it is undisputed that Schnuerle was not terminated by Carrington, and that she instead resigned. Dkt. 4-4, ¶ 45. Thus, even if Schnuerle had established she engaged in protected activity, she cannot show she was discharged for engaging in that activity. Not only has Schnuerle failed to show she engaged in a protected activity, but Carrington did not terminate Schnuerle's employment at all, much less as a result of any protected activity.

### 3. *Constructive Discharge*

In her response to Carrington's Motion for Summary Judgment, Schnuerle argues she does not allege a claim for wrongful termination in violation of public policy, but rather asserts a claim for "constructive discharge in violation of public policy for failing to provide a safe work environment." Dkt. 20, at 7. Schnuerle does not cite any authority in support of such claim. Nor does Schnuerle identify the elements of this claim, much less offer evidence in support of such elements.

Moreover, even if Idaho would recognize a claim for constructive discharge in violation of public policy, it is untenable that Idaho courts would require a legal source for the public policy at issue with respect to a wrongful termination but would not require a legal source for the public policy at issue with respect to a constructive discharge. Schnuerle does not address, much less attempt to explain, why a constructive discharge in violation of public policy claim would not require a legal source for the claimed public policy. Schnuerle's claim thus fails as a matter of law regardless of whether Idaho courts would recognize a claim for constructive discharge in violation of public policy.[13]

Schnuerle also alleges Carrington "required her to work in unsafe and unhealthful

---

[13] While, on summary judgment, Schnuerle repeatedly suggests Carrington subjected her to a "hostile work environment," she did not allege a hostile work environment claim. *Compare* Dkt. 20-1, ¶¶ 15, 28 and Dkt. 20, at 6, 10, 11 *with* Dkt. 4-4, ¶¶ 40–75. In addition, while hostile work environments are prohibited under various federal anti-discrimination laws, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 *et seq.*, or the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, Schnuerle expressly states she "has never alleged discrimination as a member of [a] protected class or activity as the basis for her [constructive discharge in violation of public policy] claim." Dkt. 20, at 5.

conditions without appropriate protective equipment." Dkt. 4-4, ¶ 40. When asked to specify the unsafe or unhealthful conditions she was subjected to, Schnuerle responded, "[w]hat I believe to be the mold remediation."[14] Dkt. 13-5, at 148:25–149:3. Although Carrington disputes Schnuerle's characterization of the alleged remediation incident, Dkt. 13-2, ¶ 27, even if a mold remediation did occur, Schnuerle testified that she did not report the incident until ten days after she resigned. Dkt. 13-5, at 118:17–119:3. As explained above, Schnuerle cannot establish either the public policy or the causation elements of her constructive discharge claim for reporting an alleged safety violation only after she had already ended her employment with Carrington.[15]

Further, even if Idaho courts would recognize a claim for constructive discharge in violation of public policy, Schnuerle cannot establish she was constructively discharged. "Constructive discharge by itself is not actionable in an at-will employee situation." *Sherick v. Battelle Energy All., LLC*, 2009 WL 453768, at *3 (D. Idaho Feb. 20, 2008). The constructive discharge theory simply converts a resignation into a termination. *Knee v. Sch. Dist. No. 139*, 676 P.2d 727, 730 (Id. Ct. App. 1984).

Under Idaho law, "it is not appropriate to apply the doctrine of constructive

---

[14] When asked if there was anything outside of the mold remediation incident that she was referring to when alleging she "was required to work in unsafe and unhealthful conditions without appropriate protective equipment," Schnuerle responded "no." *Id.* at 148:18–149:3.

[15] For the first time on summary judgment, Schnuerle also alleges she was told to carry out duties she believed "would be illegal, unlawful, or unethical." Dkt. 20, at 5–6. During her deposition, Schnuerle could not identify anything Carrington told her to do, or anything that she reported to Carrington or anyone else prior to her resignation, that was illegal or unlawful. Dkt. 13-5, at 141:6–13, 153:15–154:4. Nor has Schnuerle's counsel cited any Idaho statute or other legal authority to suggest either that Carrington violated any laws, or that Schnuerle was asked to do anything illegal. *See generally*, Dkt. 4-4, Dkt. 20, Dkt. 20-1.

discharge absent facts showing harassment, intimidation, coercion, or other aggravating conduct on the party of the employer which renders working conditions intolerable." *Id*. "Constructive discharge involves something more than normal harassment, and it does not lie unless conditions are beyond ordinary discrimination." *Allred v. Home Depot USA, Inc.*, 2019 WL 2745731, at *13 (D. Idaho June 28, 2019) (cleaned up).

> Similarly, the Ninth Circuit has held that:

> Constructive discharge occurs when the working conditions deteriorate, *as a result of discrimination*, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and serve his or her employer. We set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was tolerable.

*Poland v. Chertoff*, 494 F.3d 1174, 1185 (9th Cir. 2007) (emphasis added) (cleaned up).

As noted, Schnuerle contends she has "never alleged discrimination as a member of [a] protected class or activity as the basis for her [public policy] claim." Dkt. 20, at 5. Yet, Schnuerle does not cite *any* authority to suggest Idaho courts recognize a claim for constructive discharge in the absence of discrimination. The Court accordingly declines to extend the constructive discharge theory to Schnuerle's public policy claim.

### 4. Retaliation

Finally, although Schnuerle highlights that her September 4, 2020 letter cited "multiple concern[s] and fears of retaliation by Watkins for complaining," Schnuerle did not allege a retaliation claim. Dkt. 20-1, at 6; Dkt. 4-4, ¶¶ 40–75. Even if she had, the record belies Schnuerle's allegations of retaliation. Specifically, Schnuerle's September 4, 2020

letter stated she was being retaliated against for submitting her August 17, 2020 letter because, after she submitted the letter: (1) Watkins asked Corbett about Schnuerle's PTO for an upcoming medical procedure; (2) Watkins asked students and recent graduates leading questions about Schnuerle in an apparent attempt to obtain negative information about Schnuerle; and (3) Watkins made allegedly retaliatory scheduling changes to Schnuerle's Pharmacology lectures. Schnuerle's letter also maintained she was afraid of losing her job because Watkins was "in charge" and appeared to be aware that Schnuerle had complained about her. Dkt. 13-6, Ex. 6.

With respect to Watkins' inquiry about Schnuerle's PTO, Schnuerle suggests there was "no other reason than retaliation that Watkins would have inquired about Plaintiff's time off with Corbett because Corbett wouldn't be responsible for employee PTO as he is Defendant's Employee Relations Consultant." Dkt. 20-1, ¶ 8. Yet, Schnuerle testified during her deposition that she was unaware what Carrington's process for handling PTO requests was, and confirmed she was unsure whether Corbett was responsible for handling such requests. Dkt. 13-5, at 55:22–57:7. Even if Corbett was not responsible for PTO requests, Schnuerle does not suggest either that she was denied PTO, or that she suffered any other adverse action due to Watkins' inquiry. Nor does Schnuerle explain how Watkins' inquiry itself could be considered retaliatory. Because Schnuerle does not identify any action—let alone retaliatory action—anyone at Carrington took as a result of Watkins' inquiry about her PTO, Schnuerle's first example of Carrington's purported retaliation fails.

Schnuerle's deposition testimony also refutes her claim that she was retaliated

MEMORANDUM DECISION AND ORDER - 28

against because Watkins purportedly asked students and recent graduates leading questions in an attempt to obtain negative information about Schnuerle. Specifically, although Watkins allegedly obtained complaints about Schnuerle from some Carrington students,[16] Schnuerle confirmed she did not receive a write-up, or any other form of disciplinary action, as a result of such complaints. *Id*. at 47:22–25. In fact, Schnuerle was never disciplined while working for Carrington. *Id*. at 141:17–25. Again, Schnuerle fails to bridge the gap between Watkins' conduct and any retaliatory action she suffered.

Next, with respect to Watkins' retaliatory scheduling changes, Schnuerle admits that Watkins did not go through with making such changes when Schnuerle complained about them. *Id*. at 57:8–59:23. Schnuerle does not explain how the proposed scheduling changes can be considered retaliatory when they were never, in fact, implemented.

Schnuerle's deposition testimony also contradicts her claim that she was in danger of losing her job because Watkins was "in charge." Dkt. 13-6, Ex. 6. In addition to testifying that she was never disciplined while working for Carrington, Schnuerle confirmed: (1) Carrington never took any actions that caused her to be concerned her employment would be terminated; (2) no one at Carrington ever told her not to raise her safety concerns; and (3) she resigned and was not fired. Dkt. 13-5, at 72:11–13, 141:17–142:9. Prior to her resignation, Schnuerle also never indicated to Watkins—or to anyone else at Carrington—that she would feel compelled to resign if her safety concerns were not

---

[16] Schnuerle testified that she: (1) did not know what the student complaints were; (2) could not provide context for, or elaborate about, the student complaints; and (3) had no knowledge of what leading questions Watkins purportedly asked. Dkt. 13-5, at 44:22–46:10.

addressed. *Id*. at 151:4–10. Instead, Schnuerle simply quit and sued, without even notifying Carrington of the safety concerns she has identified in this lawsuit, much less giving Carrington the opportunity to address them. *Id*. at 89:8–16, 98:20–99:11, 107:21–108:5. 116:10–118:25, 130:10–131:18, 131:19–132:15, 134:6–20, 138:5–9, 151:1–154:4.

Further, like a claim of constructive discharge or a hostile work environment, retaliation claims are typically brought under federal antidiscrimination statutes, such as Title VII. *See, e.g., Miller v. Fairchild Indus., Inc*., 797 F.2d 727, 730 (9th Cir. 1986). To establish a prima facie case of retaliation, a plaintiff must show: (1) she engaged in a protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal relationship between the protected activity and the adverse employment action. *Id*. Even if Schnuerle had alleged a retaliation claim, or identified a statutory basis for such claim, the claim would fail because, as discussed above, Schnuerle has not established she engaged in a protected activity. In addition, Schnuerle testified that she was never subjected to any employee discipline, or anything that caused her to be concerned about her employment being terminated, while working for Carrington. Dkt. 13-5, at 141:17–25 As such, Schnuerle cannot establish the second and third elements of a retaliation claim, even if she had alleged one.

### 5. Conclusion

Schnuerle has not shown she engaged in a protected activity because she fails to identify a legal source for the public policy at issue. In addition, Schnuerle cannot establish she acted in furtherance of the public policy of maintaining a safe work environment because it is undisputed that she did not report Carrington's purportedly unsafe practices

while working for Carrington, and instead waited until ten days after she had already resigned to do so. In addition, Schnuerle fails to establish her discharge—whether by termination or resignation—was caused by her allegedly protected activity because she did not engage in such activity until after she resigned. Finally, Schnuerle has not identified any facts or caselaw to support her claim that she was constructively discharged. Due to Schnuerle's "complete failure of proof" on each of the essential elements of her constructive discharge in violation of public policy claim, this claim fails as a matter of law. *Celotex*, 477 U.S. at 323.

### B. Covenant of Good Faith and Fair Dealing

Schnuerle next alleges Carrington violated the covenant of good faith and fair dealing when it failed to provide her with a safe work environment. Dkt. 4-4, ¶¶ 48–52. The covenant of good faith and fair dealing is implied in all contracts, including those for employment-at-will. *Cantwell v. City of Boise*, 191 P.3d 205, 213 (Idaho 2008). A violation of the covenant of good faith and fair dealing occurs when either party violates, qualifies, or significantly impairs any benefit or right of the other party under the employment agreement. *Bollinger*, 272 P.3d at 1271. The covenant does not create new duties that are not inherent in the employment agreement itself, and instead only arises in connection with the terms agreed to by the parties. *Id.*; *see also Jones v. Micron Tech., Inc.*, 923 P.2d 486, 492 (Id. Ct. App. 1996) ("The covenant of good faith and fair dealing does not inject substantive terms into the contract but, rather, requires only that the parties perform in good faith the obligations imposed by their agreement. Thus, the duty arises only in connection with terms agreed to by the parties.") (cleaned up).

Schnuerle's Complaint does not identify any contractual obligation of which she was deprived. Dkt. 4-4, ¶¶ 48–52. Further, during her deposition, Schnuerle admitted that she does not believe Carrington breached any of its contractual obligations. Dkt. 13-5, at 155:6–8. On summary judgment, Schnuerle argues that her covenant of good faith and fair dealing claim is "based on Defendant owing Plaintiff the duty to provide a safe work environment[.]"[17] Dkt. 20, at 8. Schnuerle does not suggest, and has not provided any evidence to show, that Carrington agreed to provide a safe work environment as a term of her employment agreement. In the absence of a contractual obligation to provide a safe work environment, Schnuerle's covenant of good faith and fair dealing claim fails as a matter of law. *Bollinger*, 272 P.3d at 1271 (explaining the covenant of good faith and fair dealing "does not create new duties that are not inherent in the agreement itself," and did not apply even where the employee claimed to have been terminated for raising safety concerns).

For the first time on summary judgment, Schnuerle also argues Carrington owed her an implied duty to "not command Plaintiff to engage in potentially unlawful or illegal conduct[.]" Dkt. 20, at 8. The only "potentially" unlawful or illegal conduct Schnuerle identifies is that "she was instructed to *possibly* commit a crime or open herself to liability,"

---

[17] In her response brief, Schnuerle also contends Carrington violated the covenant of good faith and fair dealing "by failing to provide Plaintiff with a safe work environment after she notified Carrington management of the public health and safety risks" identified in her Complaint. Dkt. 20, at 9. Again, even if Carrington agreed to provide a safe work environment as an implied term of Schnuerle's employment agreement, Schnuerle did not notify Carrington of such safety risks until ten days after she had resigned, when her employment agreement had already expired. Thus, at the time she notified Carrington of the specific public health and safety risks involved in this lawsuit, Carrington no longer owed Schnuerle any contractual obligations—whether express or implied.

MEMORANDUM DECISION AND ORDER - 32

on November 5, 2020, by administering local anesthesia to a patient who had recently used methamphetamine. *Id*. at 8–9 (emphasis added). However, during her deposition, Schnuerle clarified she could not recall whether Dr. Thomas—the individual responsible for determining whether to administer anesthesia to patients—instructed her to administer anesthesia to the patient:

> Q. When Dr. Thomas approached you and asked what the deal was with the patient, I think you said he said, 'I do it in private practice,' did he tell you to administer the anesthesia? Like, did he use those words? Did he direct you to administer local anesthesia on the patient?
>
> A. I don't remember if he said that after he said, 'I do it in private practice all the time.' He said, 'It's not that big of a deal.'
>
> Q. But you don't recall if he said administer it on the patient?
>
> A. I don't recall.

Dkt. 13-5, at 84:7–18.

Schnuerle also clarified that Watkins did not order her to administer anesthesia to the patient, but rather stated if "[Dr. Thomas] says it's okay, it's okay." *Id*. at 84:24–85:1. Notably, it is undisputed that Schnuerle did not follow either Dr. Thomas or Watkins' advice, and instead simply "rescheduled and discharged the patient." Dkt. 13-2, ¶ 13; Dkt. 20-1, ¶ 13; *see also* Dkt. 13-5, at 78:23–79:8. Ultimately, because it is undisputed Schnuerle exercised her discretion to dismiss the patient from Carrington's clinic without providing the patient any anesthesia or other treatment, there is no evidence to suggest Dr. Thomas, Watkins—or anyone else at Carrington—commanded, instructed, or otherwise

compelled Schnuerle to engage in an illegal or unlawful activity.[18] Thus, even if a duty not to compel Schnuerle to engage in illegal activities could be considered an implied term of her employment agreement—a position Schnuerle cites no authority to support—Schnuerle has not shown Carrington violated this term.

In sum, Schnuerle's breach of the covenant of good faith and fair dealing claim fails as a matter of law.

### C. Unjust Enrichment

"[U]njust enrichment occurs where a defendant receives a benefit which would be inequitable to retain without compensating the plaintiff to the extent that retention is unjust." *Med. Recovery Servs., LLC v. Bonneville Billing and Collections, Inc.*, 336 P.3d 802, 805 (Idaho 2014) (citation omitted). To establish a prima facie claim for unjust enrichment, a plaintiff must show: "(1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Id.* (quoting *Stevenson v. Windermere Real Estate/Capital Grp., Inc.*, 275 P.3d 839, 842 (Idaho 2012)).

"A person confers a benefit upon another if he or she gives the other some interest in money, land, or possessions, performs services beneficial to or at the request of the other, satisfies the debt of the other, or in any other way adds to the other's advantage." *Med.*

---

[18] Moreover, as noted, Schnuerle has not cited any statutes or other authority to suggest administering a local anesthetic to a patient who had recently used methamphetamine is illegal.

*Recovery Services, LLC*, 336 P.3d at 805 (quoting 42 C.J.S. *Implied Contracts* § 9 (2013)). While conceding that "her claim for unjust enrichment is nuanced and may not fit perfectly into the legal elements of the typical claim for unjust enrichment," Schnuerle suggests Carrington was unjustly enriched when it failed to provide her with a safe work environment, and when it ordered her to perform the potentially unlawful task of administering anesthetic to the patient who had recently used methamphetamine. Dkt. 20, at 12. Schnuerle does not address how being subjected to a purportedly unsafe work environment, or administering anesthetic to the patient, could be considered beneficial, or otherwise add, to Carrington's advantage.[19]

As Schnuerle appears to recognize, there is no legal support for her theory that Carrington was unjustly enriched when it purportedly failed to provide a safe work environment and/or asked her to administer anesthesia. Instead, Idaho law is clear that when an employee has been "compensated with a salary for his services under an enforceable employment contract, and he does not claim that such compensation was unreasonable, he fails to state a claim for unjust enrichment." *Kamden-Ouaffo v. Idahoan Foods, LLC*, 243 F. Supp. 3d 1130, 1137 (D. Idaho 2017), *aff'd* F. App'x 75 (9th Cir. 2020); *see also U.S. Welding, Inc. v. Batelle Energy All., LLC*, 728 F. Supp. 2d 1110, 1116–17 (D. Idaho 2010) ("Because there is an express contract dealing with the essential subject matter of the relationship between the parties, a claim for unjust enrichment cannot apply

---

[19] Further, as explained above, Schnuerle rejected Carrington's alleged "request" for Schnuerle's "service" of administering local anesthesia to the patient who had recently used methamphetamine. *Med. Recovery Services*, 336 P.3d at 805.

unless the contract is otherwise unenforceable.").

Schnuerle admits that Carrington paid her salary, Dkt. 13-5, at 155:22–156:2, and does not suggest her employment agreement was unenforceable. *See generally*, Dkt. 4-4. And, while Schnuerle maintains Carrington was unjustly enriched by her "skills, labor, knowledge, and experience" the Court cannot conclude it would be inequitable for Carrington to retain such benefits. *Id.* at ¶ 56. "[A]fter all, the employer's retention of a benefit conferred by an employee, in exchange for a salary, is the essential purpose of the employer-employee relationship." *Kamden-Ouaffo*, 243 F. Supp. 3d at 1137.

In short, Schnuerle's unjust enrichment claim fails as a matter of law.

### E. Negligent Supervision

Like negligence, a negligent supervision claim requires a showing of a duty to conform to a certain standard of conduct, breach of that duty, a causal connection between any negligent conduct and the plaintiff's injury, and damages. *Podolan v. Idaho Legal Aid Servs., Inc.*, 854 P.2d 280, 288 (Idaho Ct. App. 1993). In the context of negligent supervision, an "employer's duty of care requires that an employer who knows of an employee's dangerous propensities control the employee so that he or she will not injure third parties." *Rausch v. Pocatello Lumber Co., Inc.*, 14 P.3d 1074, 1080 (Idaho Ct. App. 2000).

Schnuerle has not identified: (1) a certain standard of conduct to which Carrington had a duty to perform; (2) how Carrington breached this duty; (3) a causal connection between the breach and her injury; (4) or an injury she suffered as a result of Carrington's purportedly negligent supervision. Nor has Schnuerle identified any "dangerous

propensities" of a Carrington employee. *Id*. In fact, Schnuerle acknowledges that "[n]owhere in her claim for negligent supervision does she claim any specific incident as the grounds to support her [negligent supervision] claim." Dkt. 20, at 18. Instead, without citing the record, Schnuerle vaguely asserts she has "provided sufficient evidence in her complaint and through her deposition testimony to establish that Defendant likely failed to protect Plaintiff from the dangerous propensities of Defendant's employees and, but for Plaintiff's impeachable resolve, those dangerous propensities *could have resulted* in great bodily harm or death to Defendant's patients[.]" *Id*. (emphasis added). Schnuerle's conclusory statement not only falls short of establishing a genuine dispute of material fact with respect to any of the elements of negligent supervision, but also admits that an injury—to Schnuerle or anyone else—did not occur.

Because Schnuerle fails to make a showing with respect to any of the essential elements of a claim for negligent supervision, this claim fails as a matter of law.

### F. Vicarious Liability

In Idaho, "vicarious liability, or respondeat superior, is not a cause of action in itself, but is a means of assigning liability to an [employer] for the actions of [an employee] as to the other common law causes of action." *Bonner v. Alderson*, 2005 WL 2333829, at \*19 (D. Idaho Sept. 22, 2005).[20] Because, as explained herein, Schnuerle has not established

---

[20] While, in her response to Carrington's Motion for Summary Judgment, Schnuerle distinguishes the background facts of *Bonner* from those at issue here, the legal principal that vicarious liability is not a stand-alone cause of action but is rather a means of imputing liability to an employer for actionable conduct by its employee, is well-settled. *Jones v. HealthSouth Treasure Valley Hosp*., 206 P.3d 473, 479 (Idaho 2009); *Restatement (Second) of Torts* 429 (1965). Schnuerle suggests she "desires for [Carrington] to be held solely

the elements of any viable common law causes of action on which to impute liability to Carrington under the theory of vicarious liability, summary judgment is appropriately granted on this claim as well.

## V. CONCLUSION

In the absence of evidence to establish the elements of her claims for constructive discharge in violation of public policy, violation of the covenant of good faith and fair dealing, unjust enrichment, negligent supervision, and vicarious liability—as well as in the absence of any caselaw or other legal authority to support Schnuerle's novel interpretation of such claims—Carrington's Motion for Summary Judgment is GRANTED.

## VI. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. Carrington's Motion for Summary Judgment (Dkt. 13) is **GRANTED in its entirety**;

2. The Court will issue a separate judgment pursuant to Federal Rule of Civil Procedure 58.

DATED: January 16, 2024

David C. Nye
Chief U.S. District Court Judge

---

liable for the tortious acts of its employees that was carried out within the scope of their employment," but Schnuerle has neither established, nor even identified, any specific tortious acts any Carrington employees allegedly carried out. Dkt. 20, at 15; Dkt. 4-4, ¶¶ 64–69.